**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

INTERTEK USA, INC.                    CIVIL DOCKET NO. 2:24-cv-01094

VERSUS                                JUDGE DAVID C. JOSEPH

AMSPEC, LLC                           MAGISTRATE JUDGE THOMAS P.
                                      LEBLANC

## MEMORANDUM RULING

Before the Court is a MOTION FOR SUMMARY JUDGMENT (the "Motion") filed by Defendant AmSpec, LLC ("Defendant" or "AmSpec"). [Doc. 38]. Plaintiff Intertek USA, Inc. ("Plaintiff" or "Intertek") filed an Opposition, and AmSpec filed a Reply. [Docs. 40, 43]. For the following reasons, the Motion is DENIED.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This dispute arises from Intertek's allegation that its competitor AmSpec misappropriated metering and measurement equipment – specifically, seven "prover cans" and a "waterdraw unit" – from Intertek's facility in Lake Arthur, Louisiana.[1]

In the fall of 2023, AmSpec Vice President Matt Reilly ("Reilly") entered into discussions with Freddie Chapman ("Chapman"), a former Intertek employee that had been terminated by the company in August 2022, about joining AmSpec and launching a waterdraw operation in Jefferson Davis Parish. [Doc. 38-3, ¶ 5].

---

[1]    AmSpec operates a business that provides metering and measuring services for quantities of liquid, commonly referred to as a "waterdraw service." [Doc. 38-3, ¶ 3]. As a part of its "waterdraw service" business, AmSpec uses "prover cans," which are metal vessels used to calibrate and verify the precision of liquid dispensers, and "waterdraw units," large metal trailers, to verify the quantity of liquid that passes through a meter. [*Id.*].

Chapman told Reilly that his former business partner, Robert "Bo" LeJeune ("LeJeune"), who at the time was employed at Intertek's Lake Arthur facility, owned personal waterdraw equipment from his prior company, Waterdraws, LLC. [*Id.*]. Waterdraws, LLC was a company that LeJeune formed after dissolving another company he co-owned with Chapman. [Doc. 38-1, p. 6].

Reilly spoke with his superiors about potentially hiring Chapman and purchasing LeJeune's waterdraw equipment. [Doc. 38-3, ¶ 7]. But because Intertek still employed LeJeune, LeJeune only agreed to sell the equipment through Chapman as an intermediary. [*Id.*]. Specifically, LeJeune claims he sold equipment through an intermediary because he was concerned that Intertek would view his sale of the waterdraw equipment to a competitor as a conflict of interest. [Doc. 38-5, ¶ 4]. In accordance with this agreement, AmSpec paid $275,000 for a "Water Draw Equipment Bundle" consisting of a waterdraw unit, seven prover cans, toolboxes, and valves. [*Id.*]. An invoice documenting the transaction was prepared by Chapman and another former Intertek employee, Jada Ortego ("Ortego"), who both formally joined AmSpec on April 15, 2024. [Doc. 38-4, ¶ 5]. The invoice was prepared on the same day as the sale. [*Id.*, ¶ 6]. But Chapman ordered Ortego to backdate the invoice to April 8, 2024. [*Id.*]. Chapman claims he did this because he worried that selling equipment to AmSpec, who was now his employer, might appear to be a conflict of interest. [*Id.*].

On April 18, 2024, Ortego emailed a regulatory agency to schedule calibration of the seven prover cans, which would require the cans' serial numbers. [Doc. 38-6, ¶ 7]. However, Ortego could not obtain the serial numbers directly because LeJeune

had not yet delivered the cans, which were still stored at Intertek's Lake Arthur facility. [Doc. 38-5, ¶ 5]. Instead, LeJeune asked an Intertek co-worker to read the serial numbers from the cans and relay them to Ortego through Chapman. [*Id.*]. AmSpec claims that employee inadvertently read the National Institute of Standards and Technology ("NIST") numbers, not the serial numbers, from eight of Intertek's own cans rather than LeJeune's seven cans. [*Id.*]. The cans were ultimately calibrated in June and July 2024 directly from NIST under the serial numbers reflected on the invoice, which did not match the numbers in Ortego's April email. [Doc. 38-6, ¶¶ 7-8].

In late April or early May 2024, Intertek's Director of Measurement, Casey Brister ("Brister"), terminated LeJeune and assumed control of the Lake Arthur facility. [Doc. 38-2, pp. 2-3]. Brister discovered hundreds of items missing, including prover cans and a waterdraw unit, and filed an embezzlement complaint with the Jefferson Davis Parish Sheriff's Office ("JPSO") on May 28, 2024. [Doc. 38-7, pp. 3, 14-15]. On July 15, 2024, Brister alerted the JPSO that AmSpec was transporting the allegedly stolen equipment. [*Id.*, pp. 9-10, 14-18]. However, when deputies stopped an AmSpec truck and inspected the cans, the serial numbers and sizes on AmSpec's equipment did not match those Brister had reported missing, and the waterdraw unit appeared newer than the one Brister described. [*Id.*, pp. 10-11]. Following an approximately two-month investigation, JPSO Detectives Bertrand and Temple concluded there was no credible evidence that AmSpec, its employees, or LeJeune had stolen anything from Intertek. [*Id.*, pp. 4-5]; [Doc. 38-8, pp. 6, 15]. Even so, upon learning of Intertek's embezzlement allegations, AmSpec promptly rescinded

the sale and required LeJeune to return the $275,000.  [Doc. 38-3, ¶ 10]; [Doc. 38-5, ¶ 9].

Following the rescission, LeJeune returned to AmSpec's facility and discovered the waterdraw unit had been broken into and the seven cans vandalized.  [Doc. 38-5, ¶ 10].  Then, on August 14, 2024, LeJeune dumped the damaged cans in Intertek's parking lot, purportedly without being directed to do so by AmSpec.  [*Id.*].  Intertek filed this suit alleging conversion that same day.  [Doc. 1].

AmSpec filed the instant Motion on May 5, 2026.  [Doc. 38].  In its Motion, AmSpec argues that summary judgment is warranted because: (i) AmSpec did not know, nor did it have reason to know, that the equipment may have belonged to Intertek; (ii) AmSpec rescinded the sale and returned the equipment to LeJeune after learning of Intertek's claim of ownership; and (iii) Intertek cannot establish ownership.  [Doc. 38-1].

Intertek filed its Opposition on May 27, 2026.  [Doc. 40].  In its Opposition, Intertek contends that summary judgment is not warranted because, according to Intertek, the suspicious circumstances surrounding the sale, such as backdating the invoice and the transaction occurring through a strawman, create genuine disputes of material fact as to whether AmSpec knew or should have known that the equipment was stolen.[2]  [Doc. 40].  All issues having been briefed by the parties, the Motion is ripe for ruling.

---

[2]    In its Reply, AmSpec notes that Intertek's Opposition was untimely by one day.  [Doc. 43, p. 1 n.1].  Although this is true, "[d]istrict courts have broad discretion to consider untimely oppositions to motions for summary judgment." *Nelson v. Star Enter.*, 2000 WL 960513, at *1 (5th Cir. June 15, 2000).  After considering the length of delay and the issues

<u>**SUMMARY JUDGMENT STANDARD**</u>

A court should grant a motion for summary judgment when the movant can show that "there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart La., L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). But there is no genuine issue for trial – and thus a grant of summary judgment is warranted – when the record as a whole "could not lead a rational trier of fact to find for the non-moving party[.]" *Id*.

<u>**LAW AND ANALYSIS**</u>

## I.   Conversion Under the Civil Code

The parties do not dispute that conversion under the Louisiana Civil Code controls this case. Under Louisiana law, conversion occurs when there is "the unlawful interference with the ownership or possession of a movable...." *Dual Drilling Co. v. Mills Equip. Invs., Inc.*, 721 So. 2d 853, 857 (La. 1998). Conversion is not a codal cause of action; rather, it is a judicially recognized delictual remedy inferred from the Louisiana Civil Code. *See id*. at 856–57. A conversion action under Louisiana law rejects the absolute liability standard of common law conversion. *See id*. at 857 n.3. Instead, liability requires proof of fault, either an intentional wrongful

---

in dispute, this Court finds that the interests of justice are best served by considering Intertek's Opposition.

taking or an intentional wrongful retention of property known to belong to the plaintiff. *See id.* at 857; *see also Louisiana v. Guidry*, 489 F.3d 692, 702 (5th Cir. 2007). Yet, "[t]he intent required for a conversion is not necessarily that of conscious wrongdoing, but is, rather, an intent to exercise a dominion or control over the goods which is in fact inconsistent with the owner's rights." *Thibodeaux v. Bernhard*, 2025 WL 1651928, at *7 (W.D. La. June 10, 2025), *citing La. State Bar Ass'n v. Hinrich*, 486 So. 2d 116, 121 (La. 1986).

Additionally, "[t]o constitute a conversion, an intentional dispossession and/or exercise of dominion or control *over the property of another* in denial of or inconsistent with the owner's rights must be established." *Melerine v. O'Connor*, 135 So. 3d 1198, 1203 (La. App. 4th Cir. 2014), *citing Quealy v. Paine, Webbe, Jackson & Curtis, Inc.*, 475 So. 2d 756, 760 (La. 1985). Thus, under Louisiana law, "[a] conversion is committed when any of the following occurs: (1) possession is acquired in an unauthorized manner; (2) the chattel is removed from one place to another with the intent to exercise control over it; (3) possession of the chattel is transferred without authority; (4) possession is withheld from the owner or possessor; (5) the chattel is altered or destroyed; (6) the chattel is used improperly; or (7) ownership is asserted over the chattel." *Dual Drilling*, 721 So. 2d at 857.

As noted above, there must be some proof of fault in order to hold a party liable for conversion. *See id.* Here, there are multiple facts indicating AmSpec did not act with the requisite intent. First, AmSpec paid fair market value, or possibly even more, for the equipment. [Doc. 38-2, p. 13]. This indicates that AmSpec may not have known it was taking possession of property that may have rightfully belonged to

Intertek.  Second, three AmSpec employees testified that they believed LeJeune owned the equipment when he agreed to sell it to AmSpec.  [Doc. 38-3, ¶ 6]; [Doc. 38-4, ¶¶ 3-4]; [Doc. 38-6, ¶ 4].  Third, there is evidence that LeJeune himself had prior documented ownership history of the waterdraw equipment.  [Doc. 38-5, p. 3].  Fourth, two separate law enforcement officers investigated the alleged theft and found no credible evidence that AmSpec, its employees, or LeJeune stole anything from Intertek.  [Doc. 38-7, p. 5]; [Doc. 38-8, pp. 15-18].  And finally, AmSpec rescinded the sale as soon as it learned of Intertek's assertion that it actually owned the waterdraw equipment.[3]  [Doc. 38-3, ¶ 10].

But there are also facts that may be construed as circumstantial evidence of conversion.  First, LeJeune sold the waterdraw equipment to AmSpec while still an Intertek employee.  [Doc. 38-5, ¶ 4].  Second, Chapman was in the process of leaving Intertek and joining AmSpec at the time he was negotiating the sale with LeJeune.  [Doc. 38-4, ¶¶ 3-4].  Third, the invoice evidencing the purchase was backdated at Chapman's direction, allegedly because he was concerned about the appearance of impropriety.  [*Id.*, ¶ 6].  Fourth, Ortego's calibration email used the NIST numbers of Intertek's prover cans rather than the serial numbers for LeJeune's prover cans.  [*Id.*, ¶ 7].  And lastly, the transaction was conducted through a strawman, Chapman, which was admittedly done to obscure the prover cans' origin.  [*Id.*, ¶ 4].

---

[3]      But notably, conversion can occur at the moment of the wrongful acquisition, as "[a] conversion is committed when … *possession is acquired in an unauthorized manner* …" *Dual Drilling*, 721 So. 2d at 857 (emphasis added).  Thus, if a jury finds that AmSpec knew or should have known that the equipment was Intertek's at the time of the purchase, then the conversion occurred at that point. AmSpec's subsequent rescission would not, standing alone, defeat Intertek's conversion claim.  Regardless, this uncertainty indicates a genuine factual dispute regarding fault at the time of the purchase.

In sum, there are a multitude of facts from which a reasonable jury could conclude that AmSpec did – or did not – have the requisite intent for a successful conversion claim when it took possession of the prover cans.[4] Stated differently, there are genuine factual disputes regarding whether AmSpec engaged in the intentional wrongful taking or the intentional wrongful retention of property that it knew belonged to Intertek. *See Dual Drilling*, 721 So.2d at 857. The merit of Intertek's conversion claim must therefore be determined by the jury.

### CONCLUSION

For the foregoing reasons, the Court finds that there are genuine disputes of material fact precluding summary judgment. Fed. R. Civ. P. 56.

Accordingly,

IT IS HEREBY ORDERED that Defendant's MOTION FOR SUMMARY JUDGMENT [Doc. 38] is DENIED.

THUS, DONE AND SIGNED in Chambers on this 17th day of June 2026.

DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE

---

[4] There is also a genuine dispute of material fact as to whether Intertek or LeJeune actually owned the disputed prover cans. For example, Brister testified that LeJeune sold all his equipment from his previous business prior to the sale between LeJeune and AmSpec. [Doc. 40, pp. 13-14]. This genuine dispute further supports this Court's finding that summary judgment is not warranted.